**363 A.2d 1349.**

ALBERT MENARD *et al. vs.* WOONSOCKET TEACHERS' GUILD-AFT 951 *et al.*

OCTOBER 8, 1976.

PRESENT: Bevilacqua, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

BEVILACQUA, C. J. This civil action was commenced in the Superior Court upon the filing of a complaint by the plaintiffs, various named members of the Woonsocket School Committee (the School Committee) requesting a preliminary and permanent injunction restraining the de-

fendants, the Woonsocket Teachers' Guild (the Teachers' Guild or the Union), its officers, representatives, and members, from engaging in a strike or work stoppage in the Woonsocket school system. After a hearing, the requested order for a preliminary injunction was granted from which the defendants appealed. Subsequently, the School Committee filed a motion to have the defendants adjudged in contempt for failing to comply with that order. That motion was granted and the Teachers' Guild, certain named officers and members were found guilty of civil contempt. The defendants have appealed from this order as well.

The two major questions presented by these appeals may be briefly stated: (1) whether the testimony presented at the hearing provided sufficient evidence upon which to base a preliminary injunction, and (2) whether defendants violated the injunction by their failure to return to work. We hold that the trial justice's decision to grant a preliminary injunction was proper and based upon sufficient evidence and that defendants' subsequent conduct violated that order.

In August 1974 the Teachers' Guild, representing the schoolteachers in the Woonsocket school system, entered into a binding 2-year employment contract with the School Committee. A section of that agreement provided that either party had the right to reopen negotiations with respect to wages, salaries, and fringe benefits to be effective during the second year of the contract. Pursuant to that provision negotiations were begun in January of 1975. Despite numerous meetings, however, a successful resolution of the negotiations had not been concluded prior to the scheduled opening of the 1975-76 school year. On August 29, 1975, a telegram addressed to the Superintendent of Schools indicated that the membership of the Teachers' Guild had adopted a "no contract, no work" position. Nonetheless, 4 days later, as previously scheduled,

orientation day was held. Out of 459 teachers who were expected to attend that session only three were present at the various public schools. The following day, September 3, the first scheduled day for classes, again only three teachers were in attendance. As a result the Superintendent of Schools deemed it advisable to send the students home. Shortly thereafter, the School Committee filed their complaint requesting injunctive relief.

At the hearing, testimony, some of it conflicting, was heard by the trial justice who then made certain findings of fact. Essentially, he found that the public school teachers were engaged in an illegal strike or work stoppage which was causing irreparable harm to the Woonsocket school children and was threatening to continue indefinitely. Based upon what he considered to be at least a reasonable probability that the School Committee would prevail on a hearing on the merits of this case, on September 11, 1975, their prayer for preliminary injunction was granted. Picket lines which previously had been drawn around various Woonsocket public schools and manned by public school teachers were withdrawn. Shortly thereafter, the Superintendent of Schools notified the schoolteachers through the media that an injunction had been issued and announced that an orientation session would be conducted on the following day, September 12. On that day, however, only seven teachers were in attendance. This result precipitated the School Committee's motion to adjudge the Teachers' Guild, its officers and most of its members in contempt of the restraining order.

After a hearing on the contempt motion the court found that a strike was then in existence and that

"* * * by means of communication and signaling the specifics of which cannot be known, the [U]nion and its members and its officers communicated to the mem-

bership that the principle, 'no contract, no work,' was not in any way to be derogated by the preliminary injunction."

The court went on to conclude that in order to adhere to the mandate of the injunction, at the very least the Guild officers should have affirmatively advised the membership that they had an obligation to return to work and that the Guild officers themselves should have returned to work to manifest the good faith of their urgings.

As a result of its findings and conclusions, an order was entered on September 20, 1975, adjudging certain named officers of the Teachers' Guild, the Teachers' Guild itself, and those members who had actual knowledge of the injunction and participated in the strike or work stoppage, to be in contempt of the order of September 11, 1975. Before imposing the sentence, the court gave the Union officers an opportunity to take the affirmative steps necessary to comply with the preliminary injunction and avoid punitive action. With the exception of one of the named officers, they refused this opportunity and were sentenced to the Adult Correctional Institutions until such time as they expressed a willingness to the court to comply with the September 11 order.[1] The Union members who had actual notice of the injunction and violated it by not returning to work were also adjudged in contempt.[2]

## I.

The defendants' first contention is that the trial justice in granting the motion for preliminary injunction did not

[1] As a result of the parties' agreement to submit to binding arbitration and, thereafter, their acceptance of the arbitration award the defendants were released from incarceration on September 24, 1975, and an order was entered on September 25, 1975, declaring that they had purged themselves of contempt.

[2] Additionally, the September 25 order vacated that portion of the contempt order which had imposed a fine on the union members for each day of noncompliance with the injunction order.

adhere to the guidelines set down by this court in *School Comm.* v. *Westerly Teachers Ass'n,* 111 R. I. 96, 299 A.2d 441 (1973), in so far as proper recognition was not given to the conduct of the parties during the contract negotiations. Specifically, they argue that the order was predicated solely on the fact of a strike or work stoppage.

In the *Westerly* case we held that in disputes between teachers and school committees an ex parte temporary restraining order could no longer be justified upon the verified complaint of the school committee in which it is averred that the schools had not opened as scheduled and that the public had sustained irreparable harm. *Id.* at 104, 299 A.2d at 445-46. Instead before a trial justice can enter an order affording such relief he "* * * should normally conduct a hearing where [he] would review *what has gone on between the disputants* and then determine whether injunction should issue and if so, on what terms and for what period of time. *Id.* at 104-05, 299 A.2d at 446 (Emphasis added.); *School Dist.* v. *Holland Educ. Ass'n,* 380 Mich. 314, 157 N.W.2d 206 (1968).

Essentially our holding in *Westerly* was aimed at curbing the use of the judiciary as an "* * * unwitting third party at the bargaining table and a potential coercive force in the collective bargaining process," *School Comm.* v. *Westerly Teachers Ass'n, supra* at 104, 299 A.2d at 446. We recognize that the "give and take" so necessary to the negotiating process would be seriously eroded if the leverage that a preliminary injunction would exert upon a teachers' union could be utilized merely upon a showing that a strike was imminent or even in progress.

Accordingly, before a trial justice may issue a preliminary injunction there must be a sufficient showing at the hearing that such relief is necessary. Significant factors, among others, which a trial justice might consider in determining the propriety of injunctive relief are: the prob-

ability that a successful and timely resolution of negotiations can be achieved without judicial intervention, the existence of alternate administrative or legislative remedies, and the likelihood that the public will suffer irreparable harm unless the defendants' conduct is enjoined. *Timberlane Regional School Dist.* v. *Timberlane Regional Educ. Ass'n,* 114 N. H. 245, 251, 317 A.2d 555, 559 (1974). We would stress that the mere fact that the teachers are engaged in an illegal strike does not in and of itself warrant the issuance of an injunction; irreparable harm is a critical factor to be considered keeping in mind that the trial courts' and this court's ultimate concern should be the welfare of the students.

Returning now to defendants' contention, a careful examination of the record persuades us that the trial justice did not misconstrue the guidelines set out in the *Westerly* case. A hearing was held at which testimony had been presented detailing the circumstances which led to the frustration of negotiations between the disputants and, ultimately, to the closing of the public schools while the strike continued. The purpose of that testimony as already indicated was to provide the trial justice with the facts necessary to make a valid determination of whether the order requested should be granted; it was not to determine the so-called "equities" between the parties. The defendants' contention that the School Committee was not bargaining in good faith and so should be denied injunctive relief is without merit. While we recognize that an absence of good faith on the part of either or both of the parties may result in a prolongation of negotiations, its only relevance in the instant case is in determining whether there was a probability of quickly settling the strike and avoiding continued irreparable harm to the schoolchildren.

The defendants' related contention is that insufficient evidence was introduced to sustain plaintiffs' burden of

128

proof and thus it was reversible error for the trial court to order injunctive relief. We do not agree.

It is axiomatic that the office of preliminary injunction is not intended as a final determination of the merits of a controversy, but that it is intended only to continue, approximately, the status quo until the merits of the cause can be formally adjudicated. *Studley Land Co.* v. *Myers,* 81 R. I. 426, 430-31, 103 A.2d 924, 926 (1954). The granting of a prayer for preliminary injunctive relief usually follows a finding that plaintiff has shown a "* * * reasonable probability, rather than a certainty, of ultimate success on a final hearing." *Coolbeth* v. *Berberian,* 112 R. I. 558, 566, 313 A.2d 656, 660 (1974). Absent a showing of an abuse of discretion, however, we will not consider the propriety of granting injunctive relief; that is a matter better left within the sound discretion of the trial justice. *Id.* at 564-65 & n.3, 313 A.2d at 660 & n.3.

In the instant case, testimony was introduced at the hearing that a strike or work stoppage existed which was causing the Woonsocket public school children irreparable harm. Primarily, this was the result of problems attending disruption of the school calendar, i.e., an interference with the students' learning process; the failure to provide free school lunches for needy children; and the disadvantage seniors might experience from an untimely entry into the job market caused by a late school closing. Potentially, these problems could be exacerbated by the fact that the trial justice found that the strike or work stoppage which was already 8 days old when the order was entered threatened to continue indefinitely unless defendants' conduct was enjoined. This and other evidence presented at the hearing satisfies us that plaintiffs have met their burden of proof and that the trial justice was within the limits of discretion that is customarily accorded a lower court in issuing a preliminary injunction.

Nonetheless, we are aware of testimony given by defendants' witnesses which contradicts any finding of irreparable harm. But, as we have stated in numerous decisions, findings of a trial justice are entitled to great weight and will not be disturbed on appeal unless shown to be clearly wrong. *Abilheira* v. *Faria,* 102 R. I. 214, 219, 229 A.2d 758, 762 (1967). We can find no such indication in the record before us.

## II.

Before examining defendants' final contention assailing the validity of the contempt order, some brief preliminary remarks seem justified.

It has long been recognized that the propriety of a mandate contained in an order decreed by a court having competent jurisdiction cannot be questioned. *E.g., Starkweather* v. *Williams,* 31 R. I. 134, 135, 76 A. 662, 663 (1910). Rather the order must be complied with until it has been modified or dissolved. Dobbs, *Law of Remedies* §2.10 at 105 (1973), *see Walker* v. *City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). Consequently, it is no defense in a subsequent contempt proceeding that a court issuing a preliminary injunction erred in its judgment and compliance was, therefore, unnecessary.

The necessity for such a rule can be better understood when viewed in terms of its fundamental purpose: to insure the orderly resolution of controversies between litigants through remedies prescribed by the judicial process. Thus, once it has been issued, an order of the court binds those individuals to whom it was directed and who are charged with knowledge of it. Needless to say, dissatisfied litigants are not left without recourse, since it is within their discretion to decide that an appeal from an order granting injunctive relief is warranted. A recourse which is not available, however, is to disobey a court's order; conduct of this nature cannot be condoned under any

guise. As will become evident, *infra,* defendants' response to the order granting the preliminary injunction falls within this last approach.

The defendants' final argument is, essentially, that the finding of contempt was predicated solely on a failure to urge the Union members back to work and it is, therefore, invalid because the preliminary injunction did not mandate that they take any affirmative action; it only prohibited them from engaging in any strike or work stoppage.

If defendants' analysis of the injunction were correct then, in consonance with our holding in *Sunbeam Corp.* v. *Ross-Simons, Inc.,* 86 R. I. 189, 134, A.2d 160 (1957), reaffirming well-settled principles concerning restraining orders, we would be obligated to vacate the order. Significantly, in *Sunbeam,* we explained that the individual to whom an injunction is directed should not have to resort to "inference or implications to ascertain his duty or obligation thereunder." *Id.* at 194, 134 A.2d at 162. Examining the language contained in the pertinent order now before us we find no requirement that the Union officers urge their membership to return to work; in this conclusion defendants are correct.

Nonetheless their analysis suffers from a fatal defect. Initially, there can be little doubt but that the preliminary injunction proscribed any future strike or work stoppage by the Teachers' Guild *and its members.*[3] At the subsequent contempt hearing, the trial justice specifically found as a matter of fact that the Union membership was

---

[3]The order granting the School Committee's prayer for preliminary injunction reads in pertinent part:

"The defendant, Woonsocket Teachers' Guild, and each and every member thereof, is hereafter enjoined and prohibited from engaging in any work stoppage or strike in the City of Woonsocket school system from and after this day, September 11, 1975."

informed that the "no contract, no work" principle was to remain effective despite issuance of the preliminary injunction. Furthermore, he found that the Union officers participated in concerted activities which amounted to a strike. Thus, fundamentally, it was the finding that a strike existed in direct violation of the preliminary injunction which precipitated issuance of the contempt citation. It was not, as defendants contend, predicated solely on the Union officers' failure to take affirmative action.

We are aware that the trial justice at the contempt hearing chose not to believe the undisputed testimony of witnesses who indicated that no discussion concerning the injunction took place or what action would be taken in response to it and that their failure to report for work was entirely a personal decision. The trial justice, however, is entitled to reject undisputed testimony " '* * * where it contains inherent improbabilities or contradictions, which alone, or in connection with other circumstances in evidence, [satisfies him] of its falsity.' " *Gorman* v. *Hand Brewing Co.*, 28 R. I. 180, 183, 66 A. 209, 211 (1907). The fact that no direct evidence of a concerted activity amounting to a strike was introduced did not necessarily preclude him from finding that a strike in violation of the preliminary injunction was in effect; circumstantial evidence may be relied upon. The pertinent evidence adduced at the contempt hearing indicated that on September 12, the day after the news of the injunction had been carried by the media and the day scheduled for orientation, only 7 out of 459 teachers reported for work. The uniformity of such a reaction from Union members allegedly acting on their own personal beliefs is at least some indication that the teachers' absence was the result of a general concensus of opinion to refrain from work. We cannot say under the circumstances that the trial justice's finding of the existence of a strike or work stoppage was clearly wrong.

Other courts confronted with similar evidence have concluded likewise, *e.g., United States* v. *International Union, United Mine Workers of America,* 77 F.Supp. 563 (D.D.C. 1948), *aff'd,* 85 App. D.C. 149, 177 F.2d 29, *cert. denied,* 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949); *Masonite Corp.* v. *International Woodworkers of America,* 206 So.2d 171 (Miss. 1967); *In re Jersey City Educ. Ass'n,* 115 N.J. Super. 42, 278 A.2d 206 (1971).

In *United States* v. *International Union, United Mine Workers of America, supra,* a federal district court responded to the argument that a walkout of from 350,000 to 450,-000 miners did not constitute a strike action but rather was the result of a personal decision by each of the miners without instructions from the president of the union.

> "[A] union [that] is functioning * * * must be held responsible for the mass action of its members. It is perfectly obvious not only in objective reasoning but because of experience that men don't act collectively without leadership. The idea of suggesting that from 350,000 to 450,000 men would all get the same idea at once, independently of leadership, and walk out of the mines, is of course simply ridiculous." 77 F.Supp. at 566. (Emphasis added.)

Furthermore, in the instant case, the several meetings that took place subsequent to the issuance of the preliminary injunction belie the fact that no discussion took place concerning the injunction and what action would be taken in response to it. That evidence and the reasonable inferences drawn therefrom support the trial justice's factual determination and in these circumstances this court will not substitute its view for that of the trial justice. We, therefore, conclude that the trial justice's finding that all of the Union officers were participating in a concerted activity amounting to a strike or work stoppage in violation of the preliminary injunction was warranted under the existing circumstances.

We are unable, however, to justify that portion of the order adjudging the members of the Union in contempt.

Admittedly, the preliminary injunction by its express terms prohibited any Union member from engaging in an unauthorized work stoppage. Clearly such a mandate encompasses individual as well as concerted activity. Nonetheless before individual members of the Union can be adjudged in contempt they each must be afforded notice of the proceedings and an opportunity to be heard. *Lincoln* v. *Cournoyer*, 102 R. I. 512, 515-16, 232 A.2d 124, 126 (1967). Since no such procedural safeguards were followed in the instant case we are obliged to vacate that portion of the September 20, 1975 order finding the individual members of the Union in contempt.

Accordingly, the defendants' appeal is sustained in part and denied in part. The September 11, 1975 order granting the School Committee's prayer for a preliminary injunction is affirmed. So much of the September 20, 1975 order adjudging the individual members of the Union in contempt is vacated. The remainder of the September 20, 1975 order is affirmed and the case is remanded to the Superior Court.

*Richard R. Ackerman, Inc.,* for plaintiffs.

*Abedon, Stanzler, Biener, Skolnik & Lipsey, Richard A. Skolnik,* for defendants.